**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-3320
_____


GEORGE PITSILIDES,
                              Appellant

v.

WILLIAM P. BARR, Attorney General of the United States;
THOMAS E. BRANDON, Acting Director, Bureau of
Alcohol, Tobacco, Firearms and Explosives; CHRISTOPHER
WRAY, Director of the Federal Bureau of Investigation;
UNITED STATES OF AMERICA


_____


On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 3:19-cv-01736)
District Judge: Honorable Malachy E. Mannion
_____

Argued on January 8, 2025

Before: KRAUSE, BIBAS, and AMBRO, *Circuit Judges*

(Opinion filed: February 10, 2025)

Richard S. Roberts, Jr.      **[ARGUED]**
Zator Law
4400 Walbert Avenue
Allentown, PA 18104

    *Counsel for Appellant*


Brian M. Boynton
John C. Gurganus
Mark B. Stern
Michael S. Raab
Abby C. Wright
Kevin B. Soter            **[ARGUED]**
United States Department of Justice
Civil Division
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Carlo D. Marchioli
Office of United States Attorney
Middle District of Pennsylvania
Sylvia H. Rambo United States Courthouse
1501 N 6th Street, 2nd Floor
Harrisburg, PA 17102

    *Counsel for the Appellees*

_____

OPINION OF THE COURT
_____


KRAUSE, *Circuit Judge*.

In our recent decision in *Range v. Attorney General*, 124 F.4th 218 (3d Cir. 2024) (en banc) (*Range II*), we held that 18 U.S.C. § 922(g)(1), the federal felon-in-possession statute, was unconstitutional as applied to a plaintiff who, after the completion of his sentence, brought a declaratory judgment action seeking prospective protection to possess a firearm. Here, Appellant George Pitsilides seeks identical relief—a declaratory judgment entitling him to prospectively possess a firearm. But as we explained in *Range II*, a felon's entitlement to that relief turns on his individual circumstances and conduct. *See* 124 F.4th at 232.

Because the parties litigated this case in the District Court under a Second Amendment framework that has since been abrogated—and which turned on different considerations—we conclude that further factual development is needed to properly consider Pitsilides' challenge. Accordingly, we will affirm in part, vacate in part, and remand to the District Court for further proceedings.

## I.    **Background**

Pitsilides is a frequent gambler. While he operates a successful chain of restaurants in Virginia, North Carolina, and South Carolina, he has "been a professional poker player for a

good amount of years," which he describes as his "hobby." App. 38. His poker endeavors have proven quite successful, so much so that Pitsilides has competed in the World Series of Poker.

But Pitsilides' gambling activities extended beyond the professional. In 1998, he was indicted in Pennsylvania in connection with placing illegal sports bets—sometimes consisting of tens of thousands of dollars—with a bookmaker. He pleaded *nolo contendere* to one count of criminal conspiracy to commit pool selling and bookmaking and two counts of pool selling and bookmaking in Pennsylvania, in violation of 18 Pa. Con. Stat. §§ 903, 5514(1), and 5514(3). Pennsylvania classifies each of these offenses as a first-degree misdemeanor punishable by up to five years' imprisonment. *See id.* §§ 106(b)(6), 1104(1). As such, § 922(g)(1), which applies to anyone "who has been convicted [of] a crime punishable by imprisonment for a term exceeding one year," bars Pitsilides from possessing a firearm.

Following these convictions, Pitsilides continued to gamble illegally. Between 2006 and 2011, Pitsilides regularly organized poker games at his Virginia Beach property that "were staffed by security, waitresses, and dealers, all of whom worked for tips."[1] App. 52. In April 2011, a SWAT team raided one of these games, and Pitsilides was charged with three felony counts of operating an illegal gambling enterprise. He ultimately pleaded guilty to two counts of the lesser offense of owning a place where illegal gambling is occurring, each a

---

[1] These games appear to be a continuation of poker games Pitsilides originally organized in 1979 that "continued on and off for the next 27 years." App. 52.

4

Class 1 misdemeanor punishable by up to one year of imprisonment.[2] *See* Va. Code §§ 18.2-11, 18.2-329.

In October 2019, Pitsilides filed a complaint in the District Court seeking a declaration that § 922(g)(1) is unconstitutional as applied to him and an order permanently enjoining its enforcement against him. He also argued that § 922(g)(1) did not apply to him because his predicate offense fell within 18 U.S.C. § 921(a)(20)(A)'s carveout for "offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices." After conducting discovery, which yielded a set of stipulated material facts, the parties cross-moved for summary judgment.

The District Court granted summary judgment in favor of the Government, applying the two-step framework from our decision in *Binderup v. Attorney General*, 836 F.3d 336 (3d Cir. 2016) (en banc), *abrogated by New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). The Court concluded that Pitsilides failed to show his convictions were not "serious," relying on the "cross-jurisdictional consensus" that bookmaking, pool selling, and similar crimes are sufficiently

---

[2] These offenses do not serve as predicate offenses for § 922(g)(1)'s prohibition due to their maximum term of imprisonment. *See* 18 U.S.C. § 921(a)(20)(B) (excluding from § 922(g)(1) "any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less"). That is not to say, however, that those convictions must be disregarded in determining whether Pitsilides poses a continuing danger of firearm misuse. *See infra* Section III.B.2.

serious to make § 922(g)(1) constitutional as applied to him. *Pitsilides v. Barr*, No. 19-01736, 2021 WL 5441513, at \*6 (M.D. Pa. Nov. 19, 2021). It also rejected Pitsilides' argument under § 921(a)(20)(A) because his "bookmaking and pool selling offenses do not entail an element of economic harm to competition or consumers." *Id.* at \*3. This timely appeal followed.

## II.     Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. We exercise jurisdiction under 28 U.S.C. § 1291. Summary judgment is appropriate only where there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. *See Lozano v. New Jersey*, 9 F.4th 239, 243 (3d Cir. 2021). We review the District Court's grant of summary judgment *de novo*, in each instance viewing all facts in the light most favorable to the nonmoving party. *Id.*

## III.    Discussion

Pitsilides takes two positions on appeal, replaying those he advanced in the District Court. First, he contends that his predicate convictions for bookmaking and pool selling fall into § 921(a)(20)(A)'s carveout from § 922(g)(1). Second, if § 922(g)(1) does apply to him, Pitsilides argues it is unconstitutional under the Second Amendment. Both arguments fail.

### A.     Section 921(a)(20)(A)

We turn first to Pitsilides' contention that his predicate convictions fall within 18 U.S.C. § 921(a)(20)(A)'s carveout

6

from § 922(g)(1)'s application.  While framed as a secondary argument, prudence and principles of constitutional avoidance favor deciding statutory issues before constitutional ones, *see Kajmowicz v. Whitaker*, 42 F.4th 138, 153–54 (3d Cir. 2022), so we consider whether that carveout applies to Pitsilides' convictions before reaching his Second Amendment challenge.

Section 921(a)(20)(A) creates an exception to § 922(g)(1) by specifying that "[t]he term 'crime punishable by imprisonment for a term exceeding one year' does not include . . . offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices."  Pitsilides insists that his Pennsylvania bookmaking and pool selling convictions qualify as "other similar offenses" included in this section.  We disagree.

Our Court has not previously interpreted the scope of § 921(a)(20)(A), but we have little difficulty concluding that it does not encompass gambling-related crimes like bookmaking and pool selling.  As always, we begin with the text.  *See Devon Robotics, LLC v. DeViedma*, 798 F.3d 136, 142 (3d Cir. 2015). The phrase "other similar offenses relating to the regulation of business practices" follows an enumeration of particular types of offenses, namely those "pertaining to antitrust violations, unfair trade practices, [and] restraints of trade."  18 U.S.C. § 921(a)(20)(A).  We generally interpret a catchall phrase, like that contained in § 921(a)(20)(A), "in light of its surrounding context and read [it] to 'embrace only objects similar in nature' to the specific examples preceding it."  *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 217 (2024) (quoting *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 512 (2018)); *accord* Antonin Scalia & Bryan Garner, *Reading Law* 199 (2012).  This

7

foundational interpretive canon—often called *ejusdem generis*—serves the straightforward purpose of "afford[ing] a statute the scope a reasonable reader would attribute to it." *Purdue*, 603 U.S. at 218.

Here, then, we must read the "other similar offenses" clause in light of the list of offenses preceding it, which confines its meaning to those that share common attributes with "antitrust violations, unfair trade practices, [and] restraints of trade." By using the term "offenses," § 921(a)(20)(A) focuses on the "the charged violation of law." *Dreher v. United States ex rel. U.S. Bureau of Alcohol, Tobacco & Firearms*, 115 F.3d 330, 332 (5th Cir. 1997). And a charged violation of law consists of "the elements of the charged offense for the prior conviction." *United States v. Coleman*, 609 F.3d 699, 704 (5th Cir. 2010) (emphasis omitted). Accordingly, to determine whether a particular offense qualifies as a "similar offense[] relating to the regulation of business practices," we must focus on the elements of the predicate conviction.

While the statute does not specify the salient element(s), our sister circuits have converged on the element "that competition or consumers were affected." *United States v. Schultz*, 586 F.3d 526, 530 (7th Cir. 2009). We find this reasoning persuasive. So to determine whether a given predicate constitutes a "similar offense," we ask whether "the government would have been required to prove, as an element of the predicate offense, that competition or consumers were affected." *Id.*; *accord Dreher*, 115 F.3d at 332–33; *United States v. Stanko*, 491 F.3d 408, 416 (8th Cir. 2007).

Pitsilides' convictions for bookmaking and pool selling do not contain such an element. The Pennsylvania Code provides that a person is guilty of pool selling and bookmaking if he "receives, records, registers, forwards, or purports or pretends to forward, to another, any bet or wager upon the result of any political nomination, appointment or election, or upon any contest of any nature." 18 Pa. Con. Stat. § 5514(3). Thus, in Pitsilides' case, the elements of the conviction are (1) registering a bet or wager upon the result of (2) a contest of any kind. *See* Pennsylvania Suggested Standard Criminal Jury Instructions, Pa. SSJI(Crim), § 15.5514. Neither bears on competition, trade, consumers, or commerce.

Pitsilides attempts to evade this conclusion by recharacterizing his convictions as "effectively undercut[ting] the market by participating in gambling activities outside of a state-sanctioned context" and "creating unfair competition." Opening Br. 23. But we examine the elements of predicate offenses, not arguable effects on or attenuated relationships to consumers and competition. As the Seventh Circuit observed, "not all offenses related to the regulation of business practices fall within [§ 921(a)(20)(A)'s] exclusion," *Schultz*, 586 F.3d at 530, and this elements-focused inquiry ensures consistency of application and avoids inflating the catchall phrase to sweep in offenses plainly distinct from "antitrust violations, unfair trade practices, [and] restraints of trade," 18 U.S.C. § 921(a)(20)(A).

Because Pitsilides' predicate convictions do not contain an element that competition or consumers were affected, they do not qualify for § 921(a)(20)(A)'s carveout, and Pitsilides falls within the scope of § 922(g)(1)'s prohibition.

9

B.     Section 922(g)(1)

Having concluded that § 922(g)(1) applies to Pitsilides, we next consider whether that application is constitutional. Pitsilides contends it is not because, he argues, there is "no historical tradition of permanent disarmament for gambling related offenses," Appellant's Second Suppl. Letter Br. 1, and he does not pose "a credible threat to a person or society," Appellant's Third Suppl. Letter Br. 4.

We recognize that Pitsilides brought this declaratory judgment action in October 2019, so this case was litigated and decided under our decision in *Binderup*.  But much has changed since then.  After the District Court rejected Pitsilides' Second Amendment challenge, the Supreme Court decided *Bruen*, which effected a sea change in Second Amendment law.  Last term, the Supreme Court decided *United States v. Rahimi*, 602 U.S. 680 (2024), which refined and clarified *Bruen*'s methodology.  And our Court has since issued its en banc decision in *Range II*, addressing an as-applied challenge to § 922(g)(1) under *Bruen* and *Rahimi*.  Below, we discuss, first, the teachings of these cases and, second, how those lessons affect the disposition of this case.

1.     *Intervening Developments in the Law*

While contemporary Second Amendment jurisprudence in many ways begins with *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court's seminal decision in *Bruen* provides the governing methodology for assessing whether modern firearm regulations comport with the Second Amendment.  There, the Court explained that this analysis proceeds in two steps:  First, we must ask whether "the Second

10

Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 24. If it does, "the Constitution presumptively protects that conduct," *id.*, and we proceed to the second step. At that point, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* To measure consistency with traditional firearm regulations, we must ask whether a modern regulation is "relevantly similar" to historical predecessors, *id.* at 29 (quoting Cass Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)), considering "how and why the regulation[] burden[s] a law-abiding citizen's right to armed self-defense," *id.* Importantly, though, finding a contemporary regulation to be "relevantly similar" to a historical restriction does not require a "historical *twin*" or "dead ringer." *Id.* at 30. Instead, the government need only produce a "representative historical analogue." *Id.* (emphasis omitted). So even where modern-day restrictions are not identical to historical analogues, they "still may be analogous enough to pass constitutional muster." *Id.*

*Rahimi* further clarified the extent to which modern firearm restrictions need to match historical analogues. There, the Supreme Court explained that, when conducting *Bruen*'s history-and-tradition inquiry, "the appropriate analysis" is not whether the challenged regulation sufficiently matches up to a historical one, but instead "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. By confirming that our focus is "the principles underlying the Second Amendment," *id.*, the Court eschewed the notion that our search for historical analogues portends "a law trapped in amber," *id.* at 691. And in measuring modern regulations' fit and justification with historical principles, we remain vigilant not to "assume[] that

11

founding-era legislatures maximally exercised their power to regulate" conduct. *Id.* at 739–40 (Barrett, J., concurring).

*Rahimi* itself helpfully illustrated this approach. There, while it "did not 'undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment,'" *id.* at 702 (quoting *Bruen*, 597 U.S. at 31), the Supreme Court examined historical surety statutes requiring individuals to post a bond before "going armed" if a magistrate determined that they "would do . . . harm or breach the peace" and affray laws preventing people from "going armed" to "terrify the good people of the land," as that could lead to public disorder and violence, *id.* at 696–97 (cleaned up) (quoting 4 William Blackstone, *Commentaries on the Laws of England* 149 (10th ed. 1787)). In short, "surety laws provided a mechanism for preventing violence before it occurred," while affray laws "provided a mechanism for punishing those who had menaced others with firearms." *Id.* at 697.

"Taken together," these dissimilar measures yielded the general principle that "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed," *id.* at 698, confirming the constitutionality of the firearm regulation at issue in that case, which prohibited anyone found to "'represent[] a credible threat to the physical safety' of another" from possessing a firearm, *id.* at 699 (quoting 18 U.S.C. § 922(g)(8)(C)(i)). So while § 922(g)(8) was "by no means identical to these founding era regimes," it "d[id] not need to be" because it "fit[] neatly within the tradition" of firearm regulation in this country. *Id.* at 698.

Most recently, our en banc Court decided *Range II*, which involved an individual who the government agreed had

committed a non-violent felony ($2,600 in food stamp fraud) over thirty years earlier, had lived an essentially law-abiding life since that time, had no history of violence, had never knowingly violated § 922(g)(1)'s prohibition while subject to it, posed no risk of danger to the public, and then filed a declaratory judgment action seeking authorization to bear arms prospectively. *See* 124 F.4th at 222–24. In those circumstances, we held § 922(g)(1)'s categorical prohibition was unconstitutional as applied to that petitioner and admonished that our decision was "a narrow one" tied to the record evidence unique to Range. *Id.* at 232.

The upshot of these cases is threefold: First, as *Bruen* and *Rahimi* make clear, our inquiry into *principles* that underlie our regulatory tradition does not reduce historical analogizing to an exercise in matching elements of modern laws to those of their historical predecessors. Instead, we must consider whether the principles embodied in different strands of historical firearm regulations, "[t]aken together," *Rahimi*, 602 U.S. at 698, support contemporary restrictions, all the while remaining vigilant "not to read a principle at such a high level of generality that it waters down the right," *id.* at 740 (Barrett, J., concurring).

Second, whatever other recourse may or may not be available, felons seeking to challenge the application of § 922(g)(1) at least may bring declaratory judgment actions. But to grant such relief, the record must be sufficient for a court to make an individualized determination that the applicant does not presently pose the kind of danger envisioned by *Rahimi* and *Range II*. In keeping with *Heller*'s conclusion that "the Second Amendment confers an individual right to keep and bear

13

arms," 554 U.S. at 622, that determination necessarily demands individualized fact-finding.

Third, while *Rahimi* and *Range II* did not purport to comprehensively define the metes and bounds of justifiable burdens on the Second Amendment right, they do, at a minimum, show that disarmament is justified as long as a felon continues to "present a special danger of misus[ing firearms]," *Rahimi*, 602 U.S. at 698, in other words, when he would likely "pose[] a physical danger to others" if armed, *Range II*, 124 F.4th at 232. Indeed, as Judge Bibas presciently observed even before *Bruen*, "[a]s an original matter, the Second Amendment's touchstone is dangerousness,"[3] *Folajtar v. Att'y*

---

[3] To be sure, because the "dangerousness" principle cannot operate "at such a high level of generality that it waters down the right," *United States v. Rahimi*, 602 U.S. 680, 740 (2024) (Barrett, J., concurring), a special danger of firearm misuse justifies disarmament when the harm at risk is relevantly similar to the kinds of harm that history shows justify disarmament, *see id.* at 698 (observing that "[s]ection 922(g)(8) restricts gun use to mitigate demonstrated threats of physical violence, just as the surety and going armed laws do"); *Range v. Att'y Gen.*, 124 F.4th 218, 276 (3d Cir. 2024) (en banc) (*Range II*) (Krause, J., concurring in the judgment) ("[We cannot] blindly defer to a categorical presumption that a given individual permanently presents a special risk of danger."). At the same time, however, a danger posed by firearm misuse today need not match a historically recognized danger with precision. *See Rahimi*, 602 U.S. at 698 (recognizing as a matter of "common sense" that "[w]hen an individual poses a clear threat of physical violence to another,

14

*Gen.*, 980 F.3d 897, 924 (3d Cir. 2020) (Bibas, J., dissenting); *see also Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting) ("[L]egislatures have the power to prohibit dangerous people from possessing guns."), and our sister circuits have articulated the principle similarly in light of *Rahimi*, *see United States v. Bullock*, 123 F.4th 183, 185 (5th Cir. 2024) (per curiam) ("The historical record demonstrates 'that legislatures have the power to prohibit dangerous people from possessing guns.'" (quoting *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting))); *United States v. Williams*, 113 F.4th 637, 657 (6th Cir. 2024) ("[O]ur nation's history and tradition demonstrate that Congress may disarm individuals they believe are dangerous."); *United States v. Jackson*, 110 F.4th 1120, 1128 (8th Cir. 2024) ("Legislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed.").

## 2.  *Implications for this Appeal*

Given the intervening developments in our Second Amendment law, we conclude that the record here is insufficient to determine whether § 922(g)(1) is unconstitutional as applied to Pitsilides—a felon who was convicted of bookmaking and pool selling years ago and who seeks prospective restoration of his firearm rights.

---

the threatening individual may be disarmed"); *id.* at 705 (Sotomayor, J., concurring) (noting that the Court upheld a law disarming individuals subject to domestic violence restraining orders even though the "law at the founding . . . protect[ed] husbands who abused their spouses").

15

As evidenced by our opinion in *Range II*, the determination that a felon does not currently present a special danger of misusing firearms may depend on more than just the nature of his prior felony. While some offenses may offer conclusive evidence that someone poses such a danger, *see, e.g.*, *Bullock*, 123 F.4th at 185; *Williams*, 113 F.4th at 663, at least with predicate offenses like Range's that did not plausibly involve the use of force or physical injury, courts must consider all factors that bear on a felon's capacity to possess a firearm without posing such a danger.[4] Thus, in *Range II*, we elaborated on Range's post-conviction conduct reflecting a special danger of misusing firearms and the absence of any facts in the record indicating he presently posed a danger to the public. *See* 124 F.4th at 232. As the Sixth Circuit similarly observed, at least one principle underlying the Second Amendment—that a legislature may disarm those who pose a physical danger to others—calls for examination of "each individual's specific characteristics," which "necessarily

---

[4] In a position that echoes our now-abrogated decision in *Binderup*, the Government urged at oral argument that we need look no further than a felon's predicate conviction because history demonstrates that "legislatures may disarm persons who have been convicted of serious crimes." Gov't Third Suppl. Letter Br. 3; *see also* Oral Arg. Tr. 29:21–30:5; 34:6–13, 16–20. But such an amorphous test for constitutional applications of § 922(g)(1) does not align with our decision in *Range II*. There, we rejected the notion that legislative designation of a particular offense as sufficiently "serious" to be punished by more than one year's imprisonment sufficed to support § 922(g)(1)'s application. *See Range II*, 124 F.4th at 230. We will not entertain the recycling of that argument under a new label.

requires considering the individual's entire criminal record—not just the predicate offense for purposes of § 922(g)(1)." *Williams*, 113 F.4th at 657–58; *see also Kanter*, 919 F.3d at 468 (Barrett, J., dissenting) (instructing courts to look beyond the "conviction" and assess whether the felon's "history or characteristics make him likely to misuse firearms").

To that extent at least, we agree with the Sixth Circuit: Courts adjudicating as-applied challenges to § 922(g)(1) must consider a convict's entire criminal history and post-conviction conduct indicative of dangerousness, along with his predicate offense and the conduct giving rise to that conviction, to evaluate whether he meets the threshold for continued disarmament. As *Range II* illustrated, consideration of intervening conduct plays a crucial role in determining whether application of § 922(g)(1) is constitutional under the Second Amendment. *See* 124 F.4th at 232. Indeed, such conduct may be highly probative of whether an individual likely poses an increased risk of "physical danger to others" if armed. *Id.*

Here, the Government contends the record is sufficient for us to conclude, in contrast to Range, that Pitsilides poses a danger if re-armed. Among other things, it points to the parties' stipulation that, following Pitsilides' 1998 bookmaking and pool selling convictions—crimes that do not necessarily involve violent conduct—he also pleaded guilty to two misdemeanor counts of owning a place where illegal gambling was occurring in Virginia. These convictions stemmed from his regular operation of poker games at his Virginia Beach property that, among other things, "were staffed by security," and ultimately were raided by a SWAT team. App. 52.

For his part, Pitsilides counters that gambling itself is not an inherently dangerous activity and that there is a dearth of Founding-era restrictions on firearm possession as a result of illegal gambling.  While he concedes that "nearly all states and the federal government regulated gambling and several states prohibited games entirely," Pitsilides insists that the Government cannot demonstrate that his disarmament is consistent with our Nation's tradition of firearm regulations because "the punishments [for those offenses] . . . did not include disarmament."  Appellant's Second Suppl. Letter Br. 9.  He also maintains that history and tradition limit disarmament to those "found to be a credible threat to a person or society," and his gambling-related offenses do not evince such a threat.  Appellant's Third Suppl. Letter Br. 4.

But that mistakes the relevant inquiry.  Our consideration of history is not a hunt for "historical twin[s]," *Bruen*, 597 U.S. at 30 (emphasis omitted), or "a doomed quest for historical dead ringers," *Range II*, 124 F.4th at 278 (Krause, J., concurring in the judgment).  Instead, we look to the principles underlying our regulatory tradition, and the question here is whether Pitsilides may be disarmed consistent with the historical principle that legislatures may disarm a person who poses a danger to the physical safety of others.  *See Rahimi*, 602 U.S. at 693 ("From the earliest days of the common law, firearm regulations have included provisions barring people from misusing weapons to harm or menace others."); *Range II*, 124 F.4th at 232 (concluding § 922(g)(1) was unconstitutional as applied when "the record contains no evidence that Range poses a physical danger to others"); *see also Bullock*, 123 F.4th at 185 (recognizing legislatures may prevent "dangerous people from possessing guns" (quoting *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting))); *Williams*, 113 F.4th at 662 (holding

18

"Congress may disarm individuals they believe are dangerous"); *Jackson*, 110 F.4th at 1128 (concluding disarmament is constitutional for people who would pose an "unacceptable risk of danger if armed").

And contrary to Pitsilides' constricted view of what makes a person a sufficient danger to remain disarmed, both history and common sense reflect that this "dangerousness" includes not only direct involvement in physical violence. For instance, "though residential burglary and drug dealing are not necessarily violent, they are dangerous because they often lead to violence." *Folajtar*, 980 F.3d at 922 (Bibas, J., dissenting); *see also Williams*, 113 F.4th at 659 (observing that legislatures may disarm those convicted of drug dealing or burglary because, while "[t]hese crimes do not always involve an immediate and direct threat of violence," they "may nonetheless pose a significant threat of danger," warranting disarmament).

But as *Bruen*, *Rahimi*, and *Range II* teach, we may not paint with such a broad brush when evaluating an individual felon's as-applied challenge. So while bookmaking and pool selling offenses may not involve inherently violent conduct, they may nonetheless, depending on the context and circumstances, involve conduct that endangers the physical safety of others. That assessment necessarily requires individualized factual findings.

Here, we know that Pitsilides committed additional gambling offenses in 2011—themselves a continuation of his illegal gambling activities that began in 1979—but we know nothing of his other post-conviction conduct indicative of dangerousness or gambling activity since then. We know his

illegal gambling business was "staffed by security, waitresses, and dealers," App. 52, consistent with a large-scale, cash-based criminal activity, such as organized crime, *see United States v. Williams*, 124 F.3d 411, 417 n.7 (3d Cir. 1997) (observing Congress has "recogni[zed] that gambling has historically provided a major source of revenue for organized crime groups"), that could carry a heightened risk of violence, but we do not know the actual scale of those operations. And we know that Pitsilides employed "security," which could imply a known risk of danger and the prospect of violent confrontation, but we know no specifics about those security guards, including whether they were armed.[5]

Given the gaps in this record, we will remand to the District Court to permit the parties to pursue additional discovery of facts probative to the prevailing Second Amendment analysis, including whether Pitsilides poses a special danger of misusing firearms in a way that would endanger others.

## IV.    Conclusion

For the foregoing reasons, we will affirm in part and vacate in part the District Court's judgment and will remand for further proceedings consistent with this opinion.

---

[5] We make these observations only to illustrate how little the record here has been developed. We do not suggest that these particular questions must be answered or that other findings by the District Court may or may not be sufficient for that Court to deny declaratory relief.