**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-3031
_____

UNITED STATES OF AMERICA

v.

ERIK MATTHEW HARRIS,
Appellant

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2:19-cr-00313-001)
District Judge: Hon. Marilyn J. Horan
_____

Argued: December 9, 2024

Before: KRAUSE, BIBAS, and AMBRO, *Circuit Judges*

(Filed: July 14, 2025)
_____

Renee Pietropaolo          **[ARGUED]**
FEDERAL PUBLIC DEFENDER'S OFFICE

1001 Liberty Avenue
1500 Liberty Center
Pittsburgh, PA 15222
      *Counsel for Appellant*

Laura S. Irwin
UNITED STATES ATTORNEY'S OFFICE
700 Grant Street
Suite 4000
Pittsburgh, PA 15219

Andrew C. Noll          **[ARGUED]**
UNITED STATES DEPARTMENT OF JUSTICE
CRIMINAL DIVISION, APPELLATE SECTION
950 Pennsylvania Avenue NW
Room 1252
Washington, DC 20530
      *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

BIBAS, *Circuit Judge*.

Guns and drugs can be a lethal cocktail. So Congress passed 18 U.S.C. § 922(g)(3), barring illegal drug users from having guns until they stop using. Erik Harris, a frequent marijuana smoker, bought guns anyway. He was convicted of possessing them and of lying about his drug use to get them. Now he challenges those convictions, claiming that the gun ban for illegal

2

drug users violates the Second Amendment and is unconstitutionally vague.

Today, we hold that history and tradition justify §922(g)(3)'s restrictions on those who pose a special danger of misusing firearms because they frequently use drugs. But we lack enough facts to tell whether the law's restrictions are constitutional as applied to Harris. Still, §922(g)(3) is not vague; it warned Harris that he could not possess guns while routinely smoking marijuana. So we will affirm in part, vacate in part, and remand for the District Court to find facts needed to apply the Second Amendment law laid out here.

## I. WHILE SMOKING MARIJUANA REGULARLY, HARRIS BUYS THREE GUNS

When Erik Harris was 21, he bought his first pistol. Before buying the gun, Harris filled out a federal form that asked if he was "an unlawful user of or addicted to marijuana." 2 App. 199. He checked "no." Eleven days later, he went back to the same dealer to buy a second pistol. Again, he filled out the same form. And again, he checked "no."

Five days later, he went out partying with one of his new guns. He got "really drunk" and high and, in the revelry, lost his new gun. 3 App. 34. The next morning, he reported it stolen. Then he went back to the same dealer to buy a third pistol as a replacement. Once again, he filled out the form. And even though he had smoked marijuana the night before, he once again checked "no" to being an unlawful user.

When Harris's missing gun turned up in a felon's hands, officers called Harris in for questioning. There, he admitted

that he smoked marijuana regularly, including earlier that same day. But throughout the interview, he gave different estimates of how often he had smoked in the past year. And he did not say how much or how often he had smoked in the weeks leading up to and during his possession of the three guns.

When police asked him if, on the federal form, he had answered honestly about his marijuana use, he hedged that it "depends which way you look at it." 3 App. 54. But he conceded that he "didn't answer honestly, for the most part" on the form. 3 App. 58. He acknowledged being an "unlawful user" of marijuana "because I do use it today." 3 App. 53.

The government charged Harris with three counts under 18 U.S.C. § 922(g)(3) for possessing each gun as an "unlawful [drug] user" and three counts under § 922(a)(6) for lying to buy each one. 2 App. 25. Harris moved to dismiss all counts. He argued that § 922(g)(3) violates the Second Amendment as applied to him. He also argued that the phrase "unlawful user" is unconstitutionally vague, invalidating both § 922(g)(3) (which bars "unlawful user[s]" from having guns) and § 922(a)(6) (which bars lying about being an unlawful user).

The District Court denied Harris's motion. It made no specific finding about how much or how often Harris was smoking in the weeks around his gun possession. But it concluded that § 922(g)(3) was constitutional as applied to Harris, using means-end scrutiny under *Binderup v. Attorney General*, 836 F.3d 336, 353, 356 (3d Cir. 2016) (en banc). Then Harris pleaded guilty to all six counts, preserving his right to appeal the issues raised in his motion to dismiss. We review the

4

District Court's denial de novo. *United States v. Gonzalez*, 905 F.3d 165, 190 (3d Cir. 2018).

## II. TWO ANALOGUES JUSTIFY § 922(g)(3)'S RESTRICTIONS FOR SOME DRUG USERS

Section 922(g)(3) bans possession of a gun by anyone "who is an unlawful user of or addicted to any controlled substance." Harris claims that this ban violates his Second Amendment rights. To assess that claim, we use a two-step test focused on the Amendment's "text and historical understanding." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 26 (2022). First, we decide whether the Amendment's text covers his conduct. *Id.* at 17. If it does, the government can justify disarming him only if doing so is "consistent with this Nation's historical tradition of firearm regulation." *Id.*

At step one, the Second Amendment presumptively protects Harris's conduct. Drug users who are adult citizens are among "the people" who fall within its scope. *Range v. Att'y Gen.*, 124 F.4th 218, 226–28 (3d Cir. 2024) (en banc). And § 922(g)(3) regulates "quintessential Second Amendment conduct: possessing a handgun." *United States v. Moore*, 111 F.4th 266, 269 (3d Cir. 2024).

So our inquiry turns on the second step: whether disarming Harris is "consistent with the principles that underpin our regulatory tradition." *United States v. Rahimi*, 602 U.S. 680, 692 (2024). Modern laws pass this test if they are "'relevantly similar' to laws that our tradition is understood to permit," especially in "[w]hy and how [they] burden[] the right." *Id.* (quoting *Bruen*, 597 U.S. at 29).

5

Though our Second Amendment law looks to history and tradition, it is not "trapped in amber." *Id.* at 691. The Amendment "permits more than just those regulations identical to ones that could be found in 1791." *Id.* at 692. We should not "assume[ ] that founding-era legislatures maximally exercised their power to regulate" and thus that every novel regulation is unconstitutional. *Id.* at 739–40 (Barrett, J., concurring). Modern regulations must rest on historical "principles" but need not squeeze into narrower historical "mold[s]." *Id.* at 692 (majority), 740 (Barrett, J., concurring). This means that the government need identify only a "historical analogue," not a "historical twin." *Id.* at 701 (majority) (quoting *Bruen*, 597 U.S. at 30). And the analogy turns on similarity in principle, not specific facts: A historical law is a fitting analogue for a modern one if it burdens Second Amendment rights for comparable reasons (the "why") using comparable means (the "how"). *Id.* at 692.

The most obviously applicable historical tradition here would be one regulating gun possession by marijuana users. Yet no Founding-era law disarmed them. That is no surprise. Despite speculation that some Founders smoked hemp, it was mainly a source of cloth, paper, and rope, not a drug. *See* Martin Booth, *Cannabis: A History* 33–37 (2003).

But the government identifies historical cousins to § 922(g)(3) that it says justify its restrictions: regulations on the dangerously drunk and dangerously mentally ill. We survey these analogues below and conclude that they support § 922(g)(3)'s constitutionality as applied to those whose drug use would likely cause them to pose a physical danger to others if armed.

6

## A. The Founding Generation incapacitated drunks who posed a risk of danger to others

After marijuana, the next most intuitive analogue to the modern mind is alcohol. Drinking lots of alcohol was a normal part of colonial life. Mark Edward Lender & James Kirby Martin, *Drinking in America: A History* 9–14 (1987). But the Founders also understood that drinking could provoke people to act dangerously. In England, drunkenness was widely decried as contributing to crime and violence. *See* Dana Rabin, *Drunkenness and Responsibility for Crime in the Eighteenth Century*, 44 J. Brit. Studies 457, 459–66 (2005). So in 1606, England banned public drunkenness, declaring it "the roote and foundacion of many other enormious Synnes, as Bloodshed Stabbinge Murder … and such lyke." 4 Jac. 1, c. 5 (1606); *see also* 4 William Blackstone, *Commentaries* \*64 (discussing the law). And justices of the peace could require twice-convicted drunks to post sureties for their good behavior; drunks who did not comply could be jailed. Michael Dalton, *The Country Justice: The Practice, Duty and Power of the Justices of the Peace* 289 (London, Henry Lintot 1746).

When the Founders crossed the Atlantic, they carried these concerns with them. Dr. Benjamin Rush, a signer of the Declaration of Independence, delegate to the Continental Congress, and preeminent Founding-era medical authority, noted that intoxication breeds crime, including "[f]ighting," "[b]urglary," and "[m]urder." Benjamin Rush, *An Inquiry into the Effects of Ardent Spirits upon the Human Body and Mind* 2 (8th ed., Boston, James Loring 1823). Likewise, he viewed "crimes and infamy … [as the] usual consequences of the intemperate use of ardent spirits." *Id.* at 13.

States recognized the danger of mixing alcohol with guns. An early Rhode Island law banned firing guns at night and in taverns, and a New York law barred shooting around New Year's Eve to prevent damage caused by combining alcohol with firearms. *See Acts & Laws of the English Colony of Rhode-Island & Providence Plantations* 120 (Newport, Hall 1767); Act of Feb. 16, 1771, ch. 1501, *reprinted in* 5 *The Colonial Laws of New York from the Year 1664 to the Revolution* 244, 244–46 (Albany, James B. Lyon 1894).

Plus, early legislatures authorized constables to confine drunks who posed a risk to others until they sobered up. *See, e.g.*, *General Laws and Liberties of the Massachusetts Colony* 81 (1672) (authorizing officers to imprison any drunk who was "abus[iv]e to" or was "striking" others); *Grants, Concessions, and Original Constitutions of the Province of New-Jersey: The Acts Passed during the Proprietary Governments, and Other Material Transactions before the Surrender Thereof to Queen Anne* 107 (1753) (ordering that drunks who "are unruly and disturbers of the Peace, shall be put in the Stocks, until they are Sober").

Some jurisdictions even locked up anyone found drunk in public. Act of June 18, 1807, *reprinted in Laws of the State of New-Hampshire, Passed from December Session, 1805, to June Session, 1810, Inclusive* 74 (Concord, N.H., Isaac Hill 1811) (empowering officers to "arrest any … common drunkards" found at night and keep them in jail "until the following day"); Act of Sept. 17, 1807, *reprinted in Compend of the Acts of Indiana, From the Year Eighteen Hundred and Seven Until That of Eighteen Hundred and Fourteen, Both Inclusive* 54–

55, 91 (Vincennes, Ind., Elihu Stout 1817) (ordering justices of the peace to imprison noisy drunks for up to "48 hours").

Others enacted surety regimes empowering magistrates to make drunkards give security for peace and good behavior or be imprisoned. *Acts and Laws of his Majesties Colony of Rhode-Island, and Providence-Plantations in America* 11 (Boston, John Allen 1719); An Act Against Breaking the Peace, *reprinted in Acts and Laws of the State of Connecticut, in America* 189 (Hartford, Elisha Babcock 1786); *The Public Laws of the State of South-Carolina* App. II at 26 (Philadelphia, Aitken & Son 1790); Act of December 26, 1792, *in Digest of the Laws of Virginia Which are A Permanent Character and General Operation* 756 n.2 (Richmond, Smith & Palmer 1841); Act of Dec. 16, 1812, *in A Digest of the Laws of the Corporation of the City of Washington to the First of June, 1823*, at 141 (Washington, D.C., James Wilson 1823) (requiring those "found … drunk in or about the streets" to "enter into security for good behaviour for a reasonable time" or be sentenced to 90 days' labor); *see also* 1 *Laws of the State of Delaware* 173–74 (New Castle, Del., Samuel & John Adams 1797) (punishing drunkenness and requiring drunks who abused arresting officers to be "bound to his or her good behaviour" as "breaker[s] of the peace"); *A Digest of the Laws of Maryland* 206 (Baltimore, Thomas Herty ed., 1799) (punishing drunkenness and requiring any drunkard who "revil[ed]" arresting officers to "give security … for his good behaviour for three months[ ] or suffer one month's imprisonment without bail").

Like the surety laws that the Court relied on in *Rahimi*, these regimes were a "form of preventive justice": Drunks had to promise not to break the peace, lest they be locked up and

9

thus disarmed. *Rahimi*, 602 U.S. at 695 (internal quotation marks omitted).

## B. The Founding Generation likewise incapacitated the mentally ill who risked endangering others

After alcohol, the next most fitting historical analogy to marijuana is how the Founders thought about the danger posed by the mentally ill. "Obviously, mental illness and drug use are not the same thing." *United States v. Veasley*, 98 F.4th 906, 912 (8th Cir. 2024). But in dealing with a new social problem like habitual marijuana use, as Judge Stras has explained, "we cannot look at history through a pinhole." *Id.* (also providing many of the sources discussed below). Instead, we must broaden our view by looking at how the Founding generation addressed all analogous problems.

And the Founding Generation often analogized intoxication to mental illness, sharing our modern intuition that "their behavioral effects overlap." *Id.* They understood "habitual drinking" as, in part, a form of "blameless insanity." Erik Fisher, *The Urge: Our History of Addiction* 47 (2022). Dr. Rush described drunkenness as "a temporary fit of madness." Rush at 6. Likewise, one of Dr. Rush's patients, a chronic drug user, was diagnosed as suffering "[i]nsanity from the use of Opium." Elizabeth Kelly Gray, *Habit Forming: Drug Addiction in America*, 1776–1914, at 20 (2023). Medical observers started seeing excessive drinking as a "significant" trigger of "madness." Mary Ann Jimenez, *Changing Faces of Madness* 72 (1987). Thomas Cooley's influential treatise later drew the same comparison. Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of*

*the American Union* \*599 n.1 (Boston, Little, Brown & Co. 1868) ("Drunkenness is regarded as temporary insanity.").

The analogy fit because the Founders understood mental illness as "a transitory condition, just like intoxication," that impaired one's mental faculties temporarily. *Veasley*, 98 F.4th at 913. Those who suffered from bouts of mental illness were called "lunatic[s]," drawn from the Latin word for the moon, on the belief that they "ha[d] lucid intervals, sometimes enjoying [their] senses, and sometimes not, and that frequently depending on the change of the moon." 1 Blackstone at \*304. (Because we focus on the history, we use the historical terms even though they offend modern ears.) Lunatics intermittently "lost the use of [their] reason" and regained it. *Id.*; *accord* Anthony Highmore, *A Treatise on the Law of Idiocy and Lunacy* 3, 104–05 (London, R. Wilks 1807); *Lunatic*, *in* 3 *A New and Complete Dictionary of Arts and Sciences* 1951 (London, Society of Gentlemen 1754). "[T]he law always imagine[d] that these accidental misfortunes [of mental illness] may be removed …." 1 Blackstone at \*305.

Still, the Founders understood that some lunatics posed a risk of endangering others because of their mental state. When a lunatic posed no danger to society, he remained free, retaining an ordinary citizen's rights and responsibilities. *Veasley*, 98 F.4th at 913; *see also* Highmore at 128–29 (stating that a will that a lunatic drew up while lucid was valid). But when officials determined that a person might be in a state of lunacy that would pose a danger to society, the lunatic temporarily lost his liberty. He was locked up in a jail, hospital, or asylum until the threat he posed abated. In eighteenth-century England, justices of the peace could lock up those "who by Lunacy, or

otherwise, are furiously mad, or are so far disordered in their Senses that they *may* be dangerous to be permitted to go abroad." Justices Commitment Act of 1743, 17 Geo. 2, c. 5, §20 (Eng.) (emphasis added). These restrictions were usually temporary, lasting "only so long as such lunacy or disorder shall continue, and no longer." Henry Care & William Nelson, *English Liberties, or the Free-Born Subject's Inheritance* 329 (6th ed., Providence, John Carter 1774).

The colonists brought these English practices with them across the Atlantic. Philadelphians who were both mentally ill and dangerous "were confined in barred cells in the basement" of a hospital; "particularly violent individuals" were "restrained … using a 'straitwaistcoat' or 'mad shirt,' or heavy arm and leg chains." Lynn Gamwell & Nancy Tomes, *Madness in America* 20 (1995). New York provided that the "furiously mad" could be "kept safely locked up" and "chained." An Act for Apprehending and Punishing Disorderly Persons, c.31 (1788), *reprinted in* 2 *Laws of the State of New York Passed at the Sessions of the Legislature Held in the Years 1785, 1786, 1787 and 1788, Inclusive* 643, 645 (Albany, Weed, Parsons & Co. 1886). Connecticut obligated local authorities to lock up temporary lunatics who might "endanger[] [others] in person or estate." An Act for Relieving and Ordering of Idiots, Impotent, Distracted, and Idle Persons §18 (1793), *in* 1 *The Public Statute Laws of the State of Connecticut* 382, 386 (Hartford, Hudson & Goodwin 1808). And Massachusetts authorized justices to confine any person "so furiously mad as to render [him] dangerous to the peace and safety of the good people." Stat. 1797, c. 62, §3, *reprinted in* 2 *Compendium and Digest of the*

12

*Laws of Massachusetts* 688 (Boston, Thomas B. Wait & Co. 1810).

To justify incapacitating someone, these officials had to predict whether he would become dangerous in periods of lunacy. They did not have to wait until he had harmed someone else. *See* Jimenez at 91–92 (noting that Boston's "maniac house" confined not only the "turbulent and almost ungovernable," but also some who "were only 'periodically' insane" and even some who "were calm and not violent" because they "were viewed as potentially dangerous"). Rather, they had "a lot of discretion" to discern when someone posed enough of a threat to public safety to warrant confinement. *Veasley*, 98 F.4th at 914. For instance, one manual for justices of the peace explained that "[a]ny person" could "confin[e]" a lunatic "as is proper in such circumstances." *Lunatics*, *in* James Parker, *Conductor Generalis: Or the Office, Duty and Authority of Justices of the Peace, High-Sheriffs, Under-Sheriffs, Coroners, Constables, Goalers* [*sic*]*, Jury-Men, and Overseers of the Poor* 290, 291 (New York, John Patterson 1788).

And these same officials had to make judgment calls to discern when a person no longer needed to be confined. Officials could not possibly monitor a person's mental state moment by moment. So people who were in a state of lunacy were "viewed as potentially dangerous," even if they were periodically lucid. Jimenez at 91–92. They could thus remain locked up until an official determined that the threat they posed had fully abated. *See id.* Those judgment calls were not exact science. Justices of the peace were typically laymen, trained neither in law nor in medicine. Chester H. Smith, *The Justice of the Peace System in the United States*, 15 Calif. L. Rev. 118, 127 (1927).

13

Temporary imprisonment required temporary disarmament. Those who were confined could not bring their guns with them into confinement. *Veasley*, 98 F.4th at 913 (collecting sources). So there was a longstanding, widespread tradition of disarming people whose mental illnesses caused them to lose their senses temporarily and pose a risk to others.

### C. History and tradition thus support § 922(g)(3)'s constitutionality as applied to drug users who would pose a risk to others if armed

"Taken together," these laws "confirm what common sense suggests": Someone who regularly uses mind-altering substances that make him a "credible threat to the physical safety of others with a gun" may be disarmed temporarily until he stops using drugs. *Rahimi*, 602 U.S. at 694, 698.

And that is precisely what § 922(g)(3) does. It bars gun possession by anyone "who is an unlawful user of or addicted to any controlled substance." Controlled substances include Schedule I drugs like heroin, LSD, and marijuana. 21 U.S.C. § 812, sched. I. An "addict" is anyone "who habitually uses any narcotic drug so as to endanger the public morals, health, safety, or welfare, or who is so far addicted to the use of narcotic drugs as to have lost the power of self-control with reference to his addiction." 21 U.S.C. § 802(1). And a "user" is anyone who has "engaged in regular use [of drugs] over a period of time proximate to or contemporaneous with the possession of the firearm." *United States v. Augustin*, 376 F.3d 135, 139 (3d Cir. 2004). So by its own terms, § 922(g)(3) temporarily bars anyone who often uses drugs from possessing a gun shortly before, during, or after using drugs.

14

That restriction is well-grounded in history. By taking guns out of the hands of frequent drug users, §922(g)(3) addresses a problem comparable to the one posed by the dangerously mentally ill and dangerous drunks: a risk of danger to the public due to an altered mental state. And its temporary restriction on gun rights is analogous to these historical restrictions as well. Of course, §922(g)(3) "is by no means identical to" these historical precursors. *Id.* "[B]ut it does not need to be"; its temporary restriction on drug users who would pose a risk of danger with a gun in their hands "fits neatly" within this historical tradition. *Id.*

*First,* the historical laws targeted a problem comparable to the one that §922(g)(3) addresses as applied to drug users who would risk danger to others if armed. Both the drunkenness and lunacy laws temporarily incapacitated people based on the judgment that their impaired mental state posed a risk to others. The lunacy laws authorized officials to confine lunatics based on an individualized finding "that there would be some *risk* of 'mischief' without it." *United States v. Cooper*, 127 F.4th 1092, 1096 (8th Cir. 2025) (emphasis added) (quoting *Veasley*, 98 F.4th at 914 (quoting Daniel Davis, *A Practical Treatise upon the Authority and Duty of Justices of the Peace in Criminal Prosecutions* 41 (Boston, Hilliard, Gray, Little, & Wilkins 2d ed. 1828))). This meant that someone could be deemed "dangerous" and so needing confinement before he had harmed or threatened anyone. Officials did not need to wait for the danger to materialize. But such findings were still always based on an "individualized assessment" rather than a categorical judgment. *Id.*

15

Likewise, Founding-era legislatures often required drunks to post bonds for their good behavior or face imprisonment, based on the judgment that drunks posed a risk to public peace and the safety of others. *See, e.g.*, *Acts and Laws of the State of Connecticut* at 189; *The Public Laws of the State of South-Carolina* App. II at 26. In this way, both the drunkenness and lunacy laws operated like the surety and going-armed laws that the Supreme Court blessed in *Rahimi*: They "permit[ted] the disarmament of individuals who pose a credible threat to the physical safety of others," thereby "providing a mechanism for preventing violence before it occurred." *Rahimi*, 602 U.S. at 693, 697. And they both did so based on a risk assessment: Is someone likely to pose a danger to others because of his impaired mental state?

*Second,* the historical laws imposed a comparable, indeed lesser, burden on gun rights. The lunacy laws authorized magistrates to lock up in jails, hospitals, or asylums mentally ill people who they found posed a risk to others. So did Massachusetts's and New Jersey's drunkenness laws and many states' surety laws, which authorized locking up drunks who broke their promises to stay dry. Imprisonment necessarily involved disarmament. *Veasley*, 98 F.4th at 913 (collecting sources). And "if imprisonment was permissible" to protect "the physical safety of others, then the lesser restriction of temporary disarmament that [§ 922(g)(3)] imposes is also permissible." *Rahimi*, 602 U.S. at 699.

Plus, § 922(g)(3)'s burden is temporary. It forbids gun possession only as long as someone is using drugs regularly and so "likely poses an increased risk of physical danger to others if armed." *Pitsilides v. Barr*, 128 F.4th 203, 212 (3d Cir. 2025)

16

(internal quotation marks omitted). To be sure, drug users who flout the ban will face a felony conviction, and felons can be disarmed. *See* 18 U.S.C. §922(g)(1). But as we have recognized, disarmed felons may bring declaratory judgment actions or petition the Attorney General to get their rights back. *See Range*, 124 F.4th at 232; 18 U.S.C. § 925(c). Section 922(g)(3)'s "limited duration" thus tracks the historical restrictions on lunatics or drunks, which were also temporary and ceased once someone regained his senses or sobered up. *Rahimi*, 602 U.S. at 699.

Our partially dissenting colleague parts ways with us, contending that a test focused on *risk* of danger impermissibly lowers the bar. According to our dissenting colleague, someone must be "plainly" dangerous to be disarmed. Dissent at 6. Anything else flouts the history and precedent that binds us, he says. Yet it is the other way around. To start, the history clearly shows that officials did not need to wait to act until a drunkard or mentally ill person had harmed another. Rather, as our sister circuit has acknowledged, officials determined whether to confine a "lunatic" based on whether there would be "some *risk* of mischief without it." *Cooper*, 127 F.4th at 1096 (emphasis added) (internal quotation marks omitted). The same goes for drunks. True, as our dissenting colleague points out, a few laws let officials confine drunks only after they acted abusively. Dissent at 4–5. But that plucks out a handful of the dozen that we cite, obscuring historical reality. *See Bruen*, 597 U.S. at 65–66 (cautioning against cherry-picking history). Many other laws deemed mere drunkenness sufficient to justify temporary disarmament. *See*, *e.g.*, *Acts and Laws of the State of Connecticut* at 189 (authorizing officials to make any "drunkard[ ]" post

17

surety for good behavior or be imprisoned); *The Public Laws of the State of South-Carolina*, App. II at 26 (same); *Digest of the Laws of Virginia Which are A Permanent Character and General Operation* at 756 n.2 (same); *A Digest of the Laws of the Corporation of the City of Washington* at 141 (same); *Acts and Laws of the State of New-Hampshire* at 74 (authorizing officials to temporarily confine drunks); *Compend of the Acts of Indiana* at 54–55 (same). Even the Connecticut surety regime, which our dissenting colleague says disarmed only those who "terrif[ied] or disquiet[ed]" others, actually authorized officials to require all "drunkards" to post surety for good behavior. *Laws of the State of Connecticut* at 189; *see* Dissent at 4. Indeed, at the Founding, the consensus was that surety laws extended to all "common drunkards," not just those who acted abusively. 4 Blackstone at *256; Parker at 348; Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* 405–406 (2d ed. 1792). So in this respect, we must part ways with the dissent on the proper principle to extract from the history: Disarmament based on danger was always based on a predictive judgment of danger, not certainty.

Our colleague equally misses the mark when he claims that we dodge binding precedent. True, *Rahimi* concluded that someone found to "pose[ ] a clear threat of physical violence to another" could be disarmed. *Rahimi*, 602 U.S. at 698. But *Rahimi* did not exhaustively catalogue when someone could be disarmed; it answered only that narrower question presented. *Id.* at 684–85 (considering as-applied challenge to §922(g)(8), which disarms those found to be a "credible threat to the physical safety of [an] intimate partner" or child). Its holding merely parroted the requirements of §922(g)(8) itself. And it

18

said no more and no less about the propriety of other restrictions. *See id.* at 698. Indeed, *Rahimi* expressly declined to "undertake an exhaustive historical analysis … of the full scope of the Second Amendment." *Id.* at 702 (internal quotation marks omitted).

The dissent similarly errs in analyzing *Pitsilides*. There, we considered only an as-applied challenge to §922(g)(1), the felon-in-possession law. And we held, based on the history we recounted in *Range*, that the Second Amendment permits disarmament, "at a minimum," when an individual "present[s] a special danger of misusing firearms," meaning he "would likely pose a physical danger to others if armed." *Pitsilides*, 128 F.4th at 210 (cleaned up). We said nothing about what might justify a different regulation, such as §922(g)(3), which targets a different problem through different means.

Of course, the history justifying §922(g)(8) or §922(g)(1) in some applications may be relevant to any Second Amendment analysis. But it is only a slice of the history that reveals the "principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. We must not blindly defer to historical principles extracted from partial surveys of history relevant to other regulations.

Even so, we discern a similar principle from the relevant history: Drug users can be disarmed based on the likelihood that they will physically harm others if armed. But here is the distinction: To assess that risk, judges need not wait until a drug user has harmed or threatened another. They may decide whether a drug user "would likely pose a physical danger to others if armed" based on the nature of someone's drug use and

the risk that it will impair his ability to handle guns safely. *Pitsilides*, 128 F.4th at 210 (cleaned up); *see also id.* at 212 (noting that conduct can be relevant if it bears on whether someone "likely poses an increased risk of physical danger to others if armed"). In divining this rule, we do not flout precedent but abide by it. *Bruen* tells us to follow the history where it leads. *See Bruen*, 597 U.S. at 17. That is all we do here.

Finally, the dissent protests the consequences, worried that our holding will disarm even his hypothetical "hunters in a duck blind." Dissent at 13. But a buzzed brain with a loaded gun sounds like a misfire waiting to happen—the exact risk that our historical tradition suggests justifies disarmament.

*****

In sum, § 922(g)(3) temporarily and constitutionally restricts the gun rights of drug users only as long as they "present a special danger of misusing firearms." *Pitsilides*, 128 F.4th at 211 (cleaned up); *see also United States v. Daniels*, 124 F.4th 967, 978–79 (5th Cir. 2025) (leaving open whether § 922(g)(3) is constitutional as applied to some marijuana users); *Cooper*, 127 F.4th at 1098 (same).

### III. ON REMAND, THE DISTRICT COURT MUST FIND MORE FACTS TO DECIDE WHETHER § 922(g)(3) IS CONSTITUTIONAL AS APPLIED TO HARRIS

The District Court let the government prosecute Harris under § 922(g)(3) without finding that Harris's frequent marijuana use increased the risk that he could not handle guns safely. We do not fault the District Court for failing to make this finding. When Harris moved to dismiss the indictment, the

20

District Court was bound to apply the means-end scrutiny dictated by *Binderup*. But then the Supreme Court decided *Bruen*, "effect[ing] a sea change in Second Amendment law" and abrogating that decision. *Pitsilides,* 128 F.4th at 208. Now "history and tradition," not "legislative interest balancing," dictates whether a law comports with the Second Amendment. *Bruen*, 597 U.S. at 22, 26.

The District Court had no chance to take the first crack at whether § 922(g)(3) is constitutional as applied to Harris under this proper framework. Plus, whether Harris's § 922(g)(3) conviction is constitutional turns on many facts unanswered by the existing record. Although Harris admitted smoking multiple times a week throughout the year *on average*, many other details are foggy. But we are not a fact-finding court. *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985). And we "are a court of review, not first view." *Frank v. Gaos*, 586 U.S. 485, 493 (2019) (internal quotation marks omitted). So we will remand for the District Court to fill in the record before applying the law outlined here.

On remand, the parties should have a chance to present their own evidence and arguments about how Harris's drug use affected his mental state and riskiness. In particular, the District Court should consider, among other factors:

- The length and recency of the defendant's use during and shortly before his gun possession;
- The drug's half-life;
- Whether use of the drug affects a person's judgment, decision-making, attention, inhibition, or impulse control;

21

- Whether the drug may induce psychosis;
- The drug's interference with a user's perception of his own impairment; and
- The long-term physical and mental effects of the use of that drug.

We include this non-exhaustive list of factors to guide the District Court's inquiry into the individual defendant's use, not to dictate it. On remand, the District Court should explore any questions that it thinks bear on the inquiry here. And future courts considering § 922(g)(3) challenges should also consider these factors in determining whether someone's drug use suggests that he "likely poses an increased risk of physical danger to others if armed." *Pitsilides,* 128 F.4th at 212 (internal quotation marks omitted).

We stress that, consistent with the history, district courts need make only probabilistic judgments of danger. A drug user need not have harmed someone, threatened harm, or otherwise acted dangerously to justify disarmament. But consistent with the history, district courts must make individualized judgments and conclude that disarming a drug user is needed to address a risk that he would pose a physical danger to others. And in doing so, they should consider the questions we have suggested here and any others needed to discern whether a particular drug user may be disarmed to prevent a risk of danger.

## IV. SECTION 922(g)(3) IS NOT VAGUE

Harris also challenges the statute as vague on its face. He objects that it does not define the phrase "unlawful user" and so does not give "ordinary people fair notice of the conduct it

22

punishes." 18 U.S.C. §922(g)(3); *Johnson v. United States*, 576 U.S. 591, 595 (2015). But that argument fails.

### A. As a rule, defendants may not facially challenge criminal laws

To challenge §922(g)(3) as facially vague, Harris must first show that it is vague as applied to his own conduct. The Supreme Court has long held that, with few exceptions, a defendant whose conduct is "clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 19 (2010) (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests.*, 455 U.S. 489, 495 (1982)). That rule "makes perfectly good sense." *United States v. Morales-Lopez*, 92 F.4th 936, 941 (10th Cir. 2024). If a statute clearly warns an ordinary person that his own conduct is a crime, he cannot dodge liability just because it might not be clear as to someone else.

Still, Harris claims that the Court jettisoned this bedrock rule in *Johnson*. There, it invalidated the Armed Career Criminal Act's residual clause as unconstitutionally vague. 576 U.S. at 597. It did so even though the clause was not vague "in all its applications" and did not consider whether it was vague as applied to the defendant's own conduct. *Id.* at 603. But it did that because of the unique problems with applying the categorical approach. *Morales-Lopez*, 92 F.4th at 942–43. Under that approach, courts had to ignore the defendant's "real-world facts" and instead hypothesize the "idealized ordinary case" of the crime. *Johnson*, 576 U.S. at 597. Those intellectual gymnastics denied defendants fair notice about what real-world conduct the residual clause punished. *Id.* at 604. But that

23

provision is worlds apart from ordinary criminal laws, like §922(g)(3), which depend not on hypotheticals, but on each case's facts.

We thus join our sister circuits in holding that *Johnson* did not abrogate the ordinary rule for facial-vagueness challenges. *See United States v. Requena*, 980 F.3d 30, 40–43 (2d Cir. 2020); *United States v. Hasson*, 26 F.4th 610, 620–21 (4th Cir. 2022); *United States v. Cook*, 970 F.3d 866, 877 (7th Cir. 2020); *United States v. Bramer*, 832 F.3d 908, 909 (8th Cir. 2016) (per curiam); *Morales-Lopez*, 92 F.4th at 942–43; *Bowling v. McDonough*, 38 F.4th 1051, 1061–62 (Fed. Cir. 2022). Harris cannot bring his facial-vagueness attack without first showing that the phrase "unlawful user" is vague as applied to his case.

**B. Section 922(g)(3) is not vague as applied to Harris**

Harris cannot clear that bar. Though there will be borderline cases, Harris's habitual marijuana smoking falls squarely within §922(g)(3)'s plain text. So the statute put him on notice that his conduct was a crime.

Of course, the exact boundaries of "unlawful user" are debatable. *See Augustin*, 376 F.3d at 138–39. But when a statute "can be made constitutionally definite by a reasonable construction," we must give it that construction. *United States v. Harriss*, 347 U.S. 612, 618 (1954). Heeding that guidance, we have held that §922(g)(3) requires a defendant to "have engaged in regular use [of drugs] over a period of time proximate to or contemporaneous with the possession of the firearm." *Augustin*, 376 F.3d at 139. That tracks the statute's text. A "user" is a "person who takes narcotic, etc., drugs," implying some

24

regularity of use. *User* (def. 1b), *Oxford English Dictionary* (2d ed. 1989). And the verb "is" in the statute speaks in the present tense, requiring the use of drugs to be close in time to the gun possession.

Harris's conduct fits the bill. He smoked unlawfully: Federal law makes marijuana illegal. 21 U.S.C. §§ 812, 841. And he did so often enough to be a "user." He admitted smoking marijuana at least several times per week around when he bought the guns, including the night before buying his third gun. So under both the statute's "text" and "settled interpretations," he had clear notice that he was breaking the law. *United States v. Lanier*, 520 U.S. 259, 267 (1997); *see also United States v. Deng*, 104 F.4th 1052, 1055 (8th Cir. 2024) (rejecting vagueness claim by frequent marijuana smoker). His vagueness challenge fails.

Future cases will require closer calls about how often and how recently one must use a drug to count as an "unlawful user." For instance, does a person who smokes marijuana sporadically before bed for chronic back pain do it regularly enough to count? These cases will present close issues not only of statutory construction, but also of Second Amendment rights. But here, the question is not close. As applied, § 922(g)(3) is not unconstitutionally vague.

## V. HARRIS'S § 922(a)(6) CONVICTIONS MUST STAND

Finally, Harris challenges his convictions for falsely denying that he was an unlawful user. At first, he claimed that there was insufficient evidence to sustain the convictions. But his reply brief disavowed that claim. Now, he claims only that if we invalidate his § 922(g)(3) convictions under either the Due

25

Process Clause or Second Amendment, we "must necessarily vacate [his] § 922(a)(6) convictions" too. Reply Br. 29.

Harris's convictions do not violate due process, so this claim would seem to rise and fall with how the District Court decides the Second Amendment issue on remand. But we do not reach this claim because Harris raised it for the first time in his reply brief. *Barna v. Bd. of Sch. Directors of Panther Valley Sch. Dist.*, 877 F.3d 136, 146 (3d Cir. 2017). Harris insists that he has made the claim all along but simply mislabeled it in his opening brief. *See United States v. Negroni*, 638 F.3d 434, 445 (3d Cir. 2011). Yet nothing in that brief suggests that he was claiming, as he does in reply, that vacating his §922(a)(6) convictions would be "part of the remedy required" if his §922(g)(3) convictions were found to violate the Second Amendment. Reply Br. 29. Harris simply changed claims midstream, so he did not preserve this one for appeal. His § 922(a)(6) convictions must stand.

*****

Common sense tells us that some mind-altering substances make people too dangerous to trust with guns. So does our nation's regulatory tradition, which has long embraced similar common-sense restrictions for drunks and the dangerously mentally ill. Temporarily disarming a frequent marijuana user like Harris may fall within that tradition. But we lack enough facts to decide if that is so. Even so, the statutory phrase "unlawful user" is not vague as applied to Harris's own frequent marijuana use while he possessed guns. Plus, Harris's convictions for lying to get the guns must stand. So we will affirm in part, vacate in part, and remand for the District Court to find

26

facts necessary to resolve Harris's Second Amendment challenge.

KRAUSE, *Circuit Judge*, concurring, with whom BIBAS, *Circuit Judge*, joins.

I join the majority opinion in full. As the majority persuasively explains, while habitual marijuana use was virtually nonexistent at the Founding, early legislatures wrestled with analogues concerns, namely drunkenness and lunacy. *See* Maj. Op. 7–14. And they imposed similar, if not more burdensome, restrictions on drunks and lunatics than those which 18 U.S.C. § 922(g)(3) imposes on users of controlled substances. I write separately, however, with some observations about our Nation's evolving—and conflicted—relationship with marijuana and how modern-day understandings may inform the application of § 922(g)(3) to habitual marijuana users.

Our regulations concerning marijuana have shifted over time with our developing uses of it and our understanding of its properties. As the majority recounts, early uses of hemp were limited to cloth, paper, and rope. *See id.* at 6. It was not until the early twentieth century that people began smoking marijuana recreationally. Martin Booth, *Cannabis: A History* 127–28 (2003). Early regulation—coming off the heels of the temperance movement—primarily consisted of state and local enforcement, until the federal government in 1937 stepped in with the Marihuana Tax Act, which imposed "onerous administrative requirements" and "prohibitively expensive taxes" that "practically curtailed the marijuana trade." *Gonzales v. Raich*, 545 U.S. 1, 11 (2005).

By the mid- to late-1960s, however, public sentiment had changed, with recreational marijuana use budding among young people. *See* James B. Slaughter, *Marijuana Prohibition*

1

*in the United States: History and Analysis of a Failed Policy*, 21 Colum. J.L. & Soc. Probs. 417, 420 (1988). And by the mid-1970s, marijuana gained wider acceptance as a recreational drug. Booth at 240. These changes in Americans' attitudes towards marijuana prompted states to revise their regulations, so that by 1973, nearly every state had substantially reduced its penalties for simple marijuana possession. Richard J. Bonnie & Charles H. Whitebread, *The Marijuana Conviction: A History of Marijuana Prohibition in the United States* 240, 278–79 (1999). Much of this deregulation has been chalked up to the congressionally directed National Commission on Marihuana and Drug Abuse's report, *Marihuana: A Signal of Misunderstanding*. *See* Slaughter at 422–24. Its comprehensive investigation into marijuana concluded, among other things, that "there is little proven danger of physical or psychological harm from the experimental or intermittent use of the natural preparations of cannabis," and that "its use at the present level does not constitute a major threat to public health." Nat'l Comm'n on Marihuana and Drug Abuse, *Marihuana: A Signal of Misunderstanding* 65, 90 (1972).

The federal government, however, remained unpersuaded. Recognizing its psychotropic effects, Congress prohibited the manufacture, distribution, dispensation, and possession of marijuana in 1970, replacing the preceding patchwork of various state and federal regulation.[1] 21 U.S.C. §§ 841(a)(1), 844(a). This federal prohibition presaged a

---

[1] While the federal government did regulate marijuana in various forms before 1970, the Controlled Substances Act was the first comprehensive federal law targeting illicit drug use and possession. *See Gonzales v. Raich*, 545 U.S. 1, 10–14 (2005).

retrenchment in public perceptions of marijuana in the 1980s, triggered by "[a]dolescent marijuana use, the appearance of cocaine use and abuse on a national scale[,] and the rising potency of marijuana."  Slaughter at 438–39.  This pendulum swing catalyzed renewed federal enforcement of marijuana prohibitions and additional federal criminal legislation targeting the drug trade.  *See id.* at 443–46; Comprehensive Crime Control Act of 1984, Pub. L. 98-473, 98 Stat. 1976.

Today, marijuana is legal to various extents in forty states, including for recreational use in twenty-four states and the District of Columbia.  *State Medical Cannabis Laws*, Nat'l Conf. of State Legislatures (June 27, 2025), https://www.ncsl.org/health/state-medical-cannabis-laws. Federal law, however, has continued to bar its use, listing it in the Controlled Substances Act as a Schedule I controlled substance, 21 U.S.C. § 812, sched. I(c)(10), meaning that in the view of Congress and the Attorney General, *id.* § 811(a), it "has a high potential for abuse," "has no currently accepted medical use in treatment in the United States," and lacks "accepted safety for use of the drug or other substance under medical supervision," *id.* § 812(b)(1).  And because marijuana is classified as a controlled substance, its users are subject to § 922(g)(3)'s ban on possession of a firearm by habitual users.  18 U.S.C. § 922(g)(3).

That brings us to the case presently before us, for even as some have pressed Congress to follow the states' lead, modern science has prompted a reassessment of that more permissive approach to marijuana use, *see, e.g.*, Rosalie Liccardo Pacula et al., *Developing Public Health Regulations for Marijuana: Lessons from Alcohol and Tobacco*, 104 Am. J. Pub. Health 1021, 1022 (2014) (recognizing the growing

consensus about "certain acute effects and consequences of chronic [marijuana] use" warranting public health regulation), with implications for as-applied challenges by marijuana users.

Clinical studies reflect that marijuana use impairs users' judgment, decision-making, attention, and inhibition, Michael L. Alosco et al., *Neuropsychology of Illicit Drug Use and Impulse Control Disorders*, *in Clinical Neuropsychology: A Pocket Handbook for Assessment* 605, 608 (Michael W. Parsons & Thomas A. Hammeke eds., 3d ed. 2014),[2] causing symptoms that mirror those of mild cognitive impairment that might arise from mental illness or alcohol, *see Cognitive Impairment*, Nat'l Cancer Inst. Dictionary, https://www.cancer.gov/publications/dictionaries/cancer-terms/def/cognitive-impairment (last visited July 10, 2025). According to some studies, these effects can last for hours after use, Alosco et al. at 608, and in frequent cannabis users, they can be more intense and last longer, Rebecca D. Crean et al., *An Evidence Based Review of Acute and Long-Term Effects of Cannabis Use on Executive Cognitive Functions*, 5 J. Addiction Med. 1, 5–6 (2011).

---

[2] *See also Harmelin v. Michigan*, 501 U.S. 957, 1002 (1991) (Kennedy, J., concurring) (observing the danger posed by "drug-induced changes in physiological functions, cognitive ability, and mood"); Nat'l Acads. of Scis., Eng'g, and Med., *The Health Effects of Cannabis and Cannabinoids: The Current State of Evidence and Recommendations for Research* 53 (2017) (explaining that the effects of marijuana intoxication include an altered "perception of time," "decreased short-term memory," and "impaired perception and motor skills," and that, at higher doses, marijuana can cause "panic attacks, paranoid thoughts, and hallucinations").

Other studies reflect that this impaired judgment, diminished motor skills, and lower inhibition make it dangerous to combine marijuana with high-risk activities. *See, e.g.*, Thomas D. Marcotte et al., *Driving Performance and Cannabis Users' Perception of Safety*, 79 JAMA Psychiatry 201, 206 (2022) (finding that even though people may not perceive that they are unsafe drivers an hour and a half after smoking marijuana, they perform worse on driving simulators); Daniel T. Myran et al., *Cannabis-Involved Traffic Injury Emergency Department Visits After Cannabis Legalization and Commercialization* JAMA Network Open, Sept. 6, 2023, art. e2331551, at 7, https://jamanetwork.com/journals/jamanetworkopen/fullarticl e/2808961 (finding that, between 2010 and 2021, cannabis-involved traffic accidents in Ontario requiring emergency-room treatment rose 475%).

Some studies show that frequent marijuana use can prolong these consequences because smoking marijuana chronically causes THC, which gives marijuana its psychoactive properties, to build up in the blood, potentially contributing to longer-lasting cognitive effects. Emese Kroon et al., *Heavy Cannabis Use, Dependence, and the Brain: A Clinical Perspective*, 115 Addiction 559, 565 (2019). One meta-analysis found that chronic marijuana use can impair decision-making, increase risk-taking, and exacerbate impulsivity for hours, days, or even a few weeks. *See* Crean et al. at 3 tbl. 2, 4–5. ("[C]hronic, heavy cannabis use[rs] show . . . enduring deficits following three weeks or more abstinence" in decision-making and other executive functions.).

5

Notably, the marijuana currently available for consumption may magnify these risks, as the marijuana available today is far more potent than it was several decades ago, containing about four times as much THC. *Compare* Mahmoud A. ElSohly et al., *Changes in Cannabis Potency over the Last Two Decades (1995–2014): Analysis of Current Data in the United States*, 79 Biological Psychiatry 613, 613 (2016) (reporting 4% THC concentration in 1995), *with* Suman Chandra et al., *New Trends in Cannabis Potency in USA and Europe During the Last Decade (2008–2017)*, 269 Eur. Archives Psychiatry & Clinical Neuroscience 5, 9 (2019) (reporting increase to 17% THC concentration by 2017).

I agree with the majority that § 922(g)(3), as applied to "those whose drug use would likely cause them to pose a physical danger to others if armed," Maj. Op. 6, is "consistent with this Nation's historical tradition" of regulating gun possession by drunks and lunatics, *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022), and reflects the type of common-sense prophylactic judgment that the Second Amendment permits, *see* Maj. Op. 14–15. We leave it to the District Court on remand to develop the record on which it relies to apply the statute to Harris. Given the cognitive and motor impairments associated with marijuana use, however, our evolving understanding of the effects of marijuana, as reflected in these types of scientific studies, will bear heavily on that determination.

6

AMBRO, *Circuit Judge*, concurring in part and dissenting in part

Erik Harris has no history of violence or threatening behavior. The Government wants to disarm him anyway under 18 U.S.C. § 922(g)(3) because he used marijuana around the time he bought his gun. Harris argues that charging him under that provision violates his Second Amendment right. I join my colleagues on a remand that would require the District Court to determine whether the Government has proven that Harris's marijuana causes him to "pose[] a clear threat of physical violence to another" before the Government can disarm him. *Pitsilides v. Barr*, 128 F.4th 203, 209 (3d Cir. 2025) (Krause, J.) (quoting *United States v. Rahimi*, 602 U.S. 680, 698 (2024)).[1] My colleagues correctly note that Harris may be disarmed if his marijuana use makes him a "credible threat to the physical safety of others with a gun." Maj. Op. 14 (citing *Rahimi*, 602 U.S. at 694, 698). But they also obscure this conclusion with language that sets the threshold for potential dangerousness too low. *See, e.g.*, *id.* at 16 ("likely pose[] an increased risk of physical danger to others if armed" (internal quotation marks omitted)), 19 (alluding to an undefined "likelihood" of risk), 20 (suggesting the District Court need only examine whether "Harris's frequent marijuana use increased the risk that he could not handle guns safely"). No other court does so, and on this I dissent.

---

[1] I also join the portion of the decision that affirms Harris's convictions under 18 U.S.C. § 922(a)(6) and the District Court's denial of his constitutional vagueness challenge to § 922(g)(3).

## I

Any modern statutory ban on firearms must be "consistent with the principles that underpin the Nation's regulatory tradition." *Rahimi*, 602 U.S. at 681 (citing *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 26–31 (2022)). A two-step framework guides our analysis.

At the first step, we ask whether the Second Amendment presumptively protects Harris's conduct. All agree that it does. Harris is among "the people" who have a right "to keep and bear [a]rms." U.S. Const. amend. II. And he was convicted under § 922(g)(3) for "quintessential Second Amendment conduct: possessing a handgun." Maj. Op. 5 (quoting *United States v. Moore*, 111 F.4th 266, 269 (3d Cir. 2024), *cert. denied*, 2025 WL 1787742 (2025)).

At the second step, the Government must prove that disarming Harris is "consistent with the Nation's historical tradition of firearm regulation." *Range v. Att'y Gen.*, 124 F.4th 218, 228 (3d Cir. 2024) (en banc) (quoting *Bruen*, 597 U.S. at 24). To carry its burden, the Government must show that § 922(g)(3) is "relevantly similar" to historical "analogue[s]," which are Founding-era laws that "impose[d] a comparable burden" with a "comparabl[e] justifi[cation]." *Bruen*, 597 U.S. at 29–30. "[I]f laws at the [F]ounding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons" are permissible. *Rahimi*, 602 U.S. at 692. But "[e]ven when a law regulates arms-bearing for a permissible reason, … it may not be compatible with the right if it does so to an extent beyond what was done at the [F]ounding." *Id.*

Case law has distilled three additional rules. First, and most important, "the Second Amendment's touchstone is dangerousness." *Pitsilides*, 128 F.4th at 210 (Krause, J.)

2

(quoting *Folajtar v. Att'y Gen.*, 980 F.3d 897, 924 (3d Cir. 2020) (Bibas, J., dissenting)). The consistent theme uniting Founding-era restrictions is that individuals who pose a threat to the physical safety of others can be disarmed. *Rahimi*, 602 U.S. at 693, 697 (addressing a challenge to § 922(g)(8)); *see also Range*, 124 F.4th at 230 (explaining that Range could not lose his Second Amendment rights without "evidence that he pose[d] a physical danger to others"). Other circuits to have addressed the question here agree. *See United States v. Cooper*, 127 F.4th 1092, 1095 (8th Cir. 2025) ("[F]or disarmament of drug users and addicts to be comparably justified [with Founding-era laws], it must be limited to those who pose a danger to others." (brackets and internal quotation marks omitted)); *United States v. Connelly*, 117 F.4th 269, 277 (5th Cir. 2024) (requiring a factfinder to determine whether the defendant "presents a danger to [himself] and others").

Second, we know that "[n]either our historical tradition nor our modern understanding of the Second Amendment … permits us to blindly defer to a categorical presumption that a given individual permanently presents a special risk of danger." *Range*, 124 F.4th at 276 (Krause, J., concurring in the judgment); *see also id.* at 230 (majority rejecting a "categorical argument" that all "those convicted of serious crimes" could be "expected to misuse firearms" because it was "far too broad" (internal quotation marks omitted)). At the Founding, the state could burden a person's Second Amendment right only after an individualized determination that he posed a physical danger to others. So today's as-applied dangerousness inquiry is common sense: if the standard for disarming drug users is dangerousness, and countless marijuana users are not dangerous, then not every marijuana user can be stripped of his gun rights. Categories are out. Individual assessments are in.

3

Finally, we know that bans on gun possession by drug users must be temporary. A person may cease to be dangerous. *See Rahimi*, 602 U.S. at 698–99. When he is no longer dangerous, he gets his rights—and guns—back. *See id.* at 699. And, per the majority, "[s]omeone who regularly uses mind-altering substances that make him a 'credible threat to the physical safety of others with a gun' may be disarmed temporarily until he stops using drugs." Maj. Op. 14 (quoting *Rahimi*, 602 U.S. at 694, 698).

II

So what relevantly similar principle at the Founding justifies applying § 922(g)(3) to Erik Harris? My colleagues agree that it has no historical twin. Maj. Op. 6. Instead, they cite Founding-era "regulations on the dangerously drunk and dangerously mentally ill." *Id*. But Founding-era lawmakers did not have free rein to disarm people who drank alcohol. The key to this "permissible reason," *Rahimi*, 602 U.S. at 692, was dangerousness caused by intoxication. *See* Maj. Op. 7 (explaining the Founding generation "understood that drinking could provoke people to act dangerously").

For example, regulations on the "dangerously drunk" punished people who were "'abus[iv]e to' or 'striking' others." *Id.* at 8 (quoting *General Laws and Liberties of the Massachusetts Colony* 81 (1672)). They also restricted the gun-rights of those who "abused" or "revil[ed]" officers, *id.* at 9 (first citing *Laws of the State of Delaware* (New Castle, Del., Samuel and John Adams 1797); and then quoting *A Digest of the Laws of Maryland* (Baltimore, Thomas Herty ed., 1799)), or who "terrif[ied] or disquiet[ed] the good People of th[e] State," An Act Against Breaking the Peace, *reprinted in Acts and Laws of the State of Connecticut, in America* 189 (Hartford, Elisha Babcock (1786)). The throughline

4

connecting these laws is that they disarmed drunkards who "pose[d] a danger to others." *United States v. Veasley*, 98 F.4th 906, 916 (8th Cir. 2024), *cert. denied*, 145 S. Ct. 304 (2024).

True, not all regulations punished "abusive" drunks. But there is no need to "cherry pick" history. Maj. Op. 17. As my colleagues suggest, the regime as a whole was aimed to ensure good behavior, prevent drunks from breaking the peace, and address threats "to the physical safety of others," *id.* at 14; *see id.* at 15 ("Founding-era legislatures often required drunks to post bonds … based on the judgment that drunks posed a risk to public peace and the safety of others."). The principle I thus draw is that Founding-era laws targeted dangerous behavior that followed from intoxication; so today those who pose a "credible threat to the physical safety of others" because of their intoxication may be disarmed. *Rahimi*, 602 U.S. at 693, 700.

The majority's analogy to laws regulating "lunatics" at the Founding is more strained. True, "[s]ociety's answer to mental illness … was to lock up anyone who was dangerous or disturbing to others." *Veasley*, 98 F.4th at 915 (internal quotation marks omitted). But while "[e]arly in this country's history[] the 'mentally ill and dangerous' ended up in jails, makeshift asylums, and mental hospitals 'with straitjackets and chains[,]' … '[t]hose who posed no danger' … 'stayed at home with their families,' with 'their civil liberties … intact.'" *Cooper*, 127 F.4th at 1095 (quoting *Veasley*, 98 F.4th at 913, 915).

Neither the majority nor the Government credibly explains how marijuana users resemble the *dangerously mentally ill*. Without a much stronger connection between marijuana use and dangerousness of the kind posed by those with serious mental illness, we cannot use the rationale

5

underlying Founding-era laws regulating those individuals to justify § 922(g)(3)'s regulation of marijuana users. *See Connelly*, 117 F.4th at 276 ("The government highlights nothing demonstrating that laws designed to confine (and consequently, disarm) those so severely mentally ill that they presented a danger to themselves and others map onto § 922(g)(3)'s rationale."); *United States v. Harrison*, 654 F. Supp. 3d 1191, 1214 (W.D. Okla. 2023) ("There are likely nearly 400,000 Oklahomans who use marijuana under state-law authorization. Lumping all those persons into a category with 'dangerous lunatics[]' … is a bridge too far.").

With this background, and assuming an analogy between alcohol intoxication and frequent marijuana use works when a marijuana user poses a threat of physical violence to another while armed, I abide a remand. No doubt dangerousness is the touchstone. *Contra* Maj. Op. 17 (suggesting I disagree with a "test focused on risk of danger"). Whether we call it a "clear threat," "credible threat," or something else, the Government must show by a preponderance of the evidence that Harris's drug use and weapon possession make him a physical danger to others.

Though my colleagues dispute my historical overview, they do not clearly explain if they draw a different principle or, if so, what it is. They instead give us varying dangerousness thresholds for one who is armed: *id.* at 3 ("pose a special danger of misusing firearms"); *id.* at 14, 16, 18 (credible threat); *id.* at 19 (likely poses a danger); *id.* at 16, 20 ("likely poses an increased risk of physical danger"); *id.* at 20 ("increased … risk"). It is the "increased risk" formulation that is both off-point and concerning. To the majority, someone who uses marijuana can be disarmed even if he plainly is not dangerous, so long as his use increases the chance he could act

6

dangerously. No Founding-era analogue justifies restricting gun possession in that circumstance.

That lower threshold of increased risk ignores the bar the Supreme Court and our Court have established. The former in *Rahimi* spoke of a physical threat being "clear," 602 U.S. at 698, "credible," *id.* at 698-702, or "demonstrated," *id.* at 698, before the Government could disarm a person.

As for our Court, the en banc decision in *Range* borrowed from *Rahimi* that threats to others had to be "clear" or "credible." *Range*, 124 F.4th at 230. Or consider *Pitsilides*, a recent application of the dangerousness standard. We explained that *Rahimi* and *Range* showed "disarmament is justified as long as a felon … 'present[s] a special danger of misusing firearms,' in other words, when he would likely 'pose a physical danger to others' if armed." *Pitsilides*, 128 F.4th at 210 (first quoting *Rahimi*, 602 U.S. at 698; and then quoting *Range*, 124 F.4th at 232) (brackets omitted). Pitsilides had operated an illegal gambling ring on and off for more than a decade. *Id.* at 205–06. He staffed his games with security, and SWAT teams had broken them up. *Id.* at 206. Plus he had a criminal record related to his gambling offenses. *Id.* at 206, 212. Adding to that, we had law establishing a link between gambling and organized crime. *Id.* at 213 (citing *United States v. Williams*, 124 F.3d 411, 417 n.7 (3d Cir. 1997) (noting "Congress[']s recognition that gambling has historically provided a major source of revenue for organized crime groups")). Even on that record, we could not answer whether Pitsilides, if armed, met the dangerousness standard from *Rahimi* and *Range*, so we remanded for the District Court to determine whether he "pose[d] a special danger of misusing firearms in a way that would endanger others." *Id.* at 213.

In making that determination, we deemed "crucial" a court's "consideration of" a defendant's "post-conviction conduct" that might "indicat[e] … dangerousness." *Id.* at 212. That is because "such conduct may be highly probative of whether an individual likely poses an increased risk of physical danger to others if armed." *Id. But that was not our holding*. We ended our opinion by emphasizing that we remanded to fill "gaps in [the] record" with "additional discovery of facts probative to the prevailing Second Amendment analysis, including whether Pitsilides poses a *special danger of misusing firearms in a way that would endanger others*." *Id.* at 213 (emphasis added). We never suggested that the Government could disarm Pitsilides if his gambling activity or criminal record merely "increased the risk that he could not handle guns safely." Maj. Op. 20. We did not, nor could we, expand the holdings of *Rahimi* and *Range* in that way.

Moreover, the majority says nothing about the level to which a person's risk must rise before the Government can disarm him. Could a person whose risk increases from negligible to slightly more than negligible be disarmed under this test? Theoretically, most people pose a slightly greater risk of danger with a gun while intoxicated than while sober. So what the majority calls an individualized dangerousness inquiry begins to look like a categorical rule in disguise. As explained above, however, the Second Amendment rarely tolerates categorical rules. *Range*, 124 F.4th at 276 ("Neither our historical tradition nor our modern understanding of the Second Amendment … permits us to blindly defer to a categorical presumption that a given individual permanently presents a special risk of danger.") (Krause, J., concurring in the judgment).

My colleagues respond by arguing that *Rahimi*, *Range*, and *Pitsilides* do not control the outcome here because they invoke different historical traditions—those justifying §§ 922(g)(1) (regulating gun possession of felons) and (g)(8) (regulating gun possession of those subject to restraining orders). Maj. Op. 18–19. But then they reach the conclusion I espouse. They concede their cited history "operated like the surety and going-armed laws that the Supreme Court blessed in *Rahimi*." *Id.* at 16. And they purport to adopt—though not consistently—principles articulated in those cases. *E.g.*, *id.* at 3 (adopting the "pose a special danger of misusing firearms" principle from *Pitsilides*); 14 (adopting the "credible threat" standard in *Rahimi* and *Range*). How do those standards fit holding here a lower standard that requires only an increased risk of danger?

The also say that the relevant tradition here—disarming the dangerously intoxicated and the dangerously mentally ill—sanctioned predictive judgments about dangerousness even before someone got hurt. Constables, after all, did not need to wait until an intoxicated person injured somebody to disarm him. I agree. But there is a difference between (a) disarming someone who presents a clear threat of danger to others based on his behavior before he has harmed another person and (b) disarming someone because he poses some undefined level of risk. The tapestry of historical regulation yields a clear principle: people could be disarmed at the Founding when they posed a danger to others because of their intoxication. By holding that the Government can disarm someone even when he does not pose a clear threat of physical violence to another by a preponderance of the evidence, the majority draws a principle unsupported by history and tradition.

9

## III

My colleagues write separately to expound their views on the dangers posed by marijuana. But that separate writing contains virtually no legal reasoning and gives almost no sense that it is meant to. It instead reads like a policy statement to Congress advocating for a marijuana ban. Using select non-record sources, my colleagues draw their own conclusions about marijuana's effects on users' judgment, decision-making, attention, and inhibition, the duration of its alleged effects on cognition, and its potency.

For instance, they cite a meta-analysis for the proposition that "chronic marijuana use can impair decision-making, increase risk-taking, and exacerbate impulsivity for hours, days, or even a few weeks." Conc. 5 (citing Rebecca D. Crean et al., *An Evidence Based Review of Acute and Long-Term Effects of Cannabis Use on Executive Cognitive Functions*, 5 J. Addiction Med. 1, 3 tbl. 2, 4–5 (2011)). They speculate that "the marijuana currently available for consumption may magnify these risks, as the marijuana available today is far more potent than it was several decades ago." *Id.* at 6 (citing Suman Chandra et al., *New Trends in Cannabis Potency in USA and Europe During the Last Decade (2008–2017)*, 269 Eur. Archives Psychiatry & Clinical Neuroscience 5, 9 (2019)). Symptoms from marijuana use, they claim, mirror those of "mild cognitive impairment that might arise from mental illness or alcohol." *Id.* at 4 (Their support for this claim is a dictionary definition for "cognitive impairment" from the National Cancer Institute that does not mention marijuana. *Id.*)

We are judges—not scientists, sociologists, or policymakers. Parsing scientific evidence in the first instance is not our role, and we generally are not good at it. This kind

10

of freewheeling appellate factfinding is inappropriate, *see Amadeo v. Zant*, 486 U.S. 214, 228 (1988) (reversing and remanding when "the Court of Appeals ... engage[d] in impermissible appellate factfinding"), in part because it relieves the Government of its duty to "affirmatively prove[] that [§ 922(g)(3)] is 'consistent with the Second Amendment's text and historical understanding,'" *Rahimi*, 602 U.S. at 737 (Barrett, J., concurring) (quoting *Bruen*, 597 U.S. at 26).

As my colleagues note, marijuana is legal in some form in 39 states and the District of Columbia. For better or worse, our Nation's democratic policymaking process has gradually liberalized laws regulating marijuana over the past few decades. I take no position on the wisdom of this trend because I am a judge, not a legislator. My colleagues have deeply-held and good-faith views about marijuana, but those views are the stuff of policy, not law, and they would be better aired in an op-ed than in the Federal Reporter.

IV

Subsection 922(g)(3) is constitutional as applied to Harris only if his marijuana use makes him a "clear threat of physical violence to another." *Pitsilides*, 128 F.4th at 209 (quoting *Rahimi*, 602 U.S. at 698). I go no further.[2] "Future cases may present other and more difficult questions .... But we take cases as they come and today [should] resolve only the question posed to us." *Bondi v. VanDerStok*, 145 S. Ct. 857,

---

[2] The majority identifies several factors for the District Court to consider on remand, like marijuana's "half-life" and "[w]hether the drug may induce psychosis." Maj. Op. 21. These may be relevant to the ultimate dangerousness inquiry, but almost none of the considerations they outline sheds light on whether Harris himself was dangerous.

869–70 (2025). It is a "fundamental principle of judicial restraint … that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) (internal quotation marks omitted).

As for Harris, here is what we know. He was a college student in 2019 with no history of violence and no prior arrests. He bought a total of three guns in February and March of that year. With each purchase he answered "no" on a federal form asking whether he was a user of or addicted to marijuana. He was, however, a regular user at that time.

Five days after he bought the second gun, Harris and his childhood friend, Jaemere Scott, celebrated Scott's mother's birthday at Scott's home and later at a bar. Harris drank alcohol and smoked marijuana that evening. When the two arrived at the bar, Scott asked Harris whether he had his gun on him, warning him not to bring it into the bar. Harris did not, thinking he had left it in his car, and they entered the bar. But when Harris and Scott left, Harris realized that the gun was not in his car after all. He went to his girlfriend's house, checked there for the gun, could not find it, and went to sleep. The next day, he searched Scott's house, another friend's house, and his car once more, but the gun was still missing. Harris then returned to the bar to look for it. Coming up empty, he called the police and reported the gun stolen. The police ultimately found it with Scott, a convicted felon. Suspecting Harris had purchased the gun for Scott, they interviewed Harris. During the interview, he denied doing so but admitted being a frequent user of marijuana.

The Government, joined by my colleagues in the majority, would disarm Harris because he could not locate his gun after smoking marijuana. But that gun was found with someone Harris grew up with and was close to personally. From the record, we do not know when (or if) he misplaced it, whether he was high at that time, or how it ended up with Scott (who may have stolen it). Despite its early suspicions that Harris had purchased the gun for Scott, the Government did not indict Harris for that conduct. In my view, nothing in the record before us suggests that he poses a danger to the physical safety of others.

V

Why not stick to the Supreme Court's Second Amendment decisions, our en banc decision in *Range*, or this very panel's holding in *Pitsilides*? An unlawful drug user may be disarmed if he poses a credible threat to the physical safety of others with a gun—that is, if it is more likely than not that his drug use paired with gun possession makes him dangerous. The waters are roiled enough that we need a breather (awaiting further clarity from the Supreme Court) to sort things out. Instead, we get yet another test—what matters this time is not dangerousness but any whiff of its increased risk, suggesting a lower threshold than before.

Many, if not most, readers of this partial dissent know someone who uses marijuana—maybe a sick friend who uses it to treat pain, an insomniac relative who uses it to sleep at night, a veteran who uses it to manage his post-traumatic stress disorder, or hunters in a duck blind.[3] Were intoxication

---

[3]  My colleagues say that a "buzzed brain with a loaded gun sounds like a misfire waiting to happen." Maj. Op. 20. But their

13

minimally to increase the risk of dangerousness associated with possessing a gun, it is hard to imagine a marijuana user whom the majority's policy-made test would not lump together with dangerous drunks and "lunatics." Indeed, the majority states categorically that "[c]ommon sense tells us that [marijuana] make[s] people too dangerous to trust with guns." Maj. Op. 26. The consequence of that reasoning could be that most of these individuals, along with countless American adults, are vulnerable to disarmament. That should give us pause. If our reasoning authorizes legislatures to suspend the constitutional rights of so many for such common behavior, it may mean that we are not taking the Supreme Court's instruction seriously and are instead drawing a "principle at such a high level of generality that it waters down the right." *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring).

The majority leaves us with an amorphous holding that flouts precedent, defies common sense, and creates a circuit split. Gun possession and marijuana use may at times be a "lethal cocktail," Maj. Op. 2, but those times are scattered in a mountain of mismatches. I concur in the judgment only to the extent that it affirms Harris's convictions under 18 U.S.C. § 922(a)(6) and the District Court's denial of his constitutional vagueness challenge to § 922(g)(3). Because the majority instructs the District Court to consider Harris's increased risk

---

folksy retort gives the game away. If we accept that simply being intoxicated is enough to be disarmed, without some individualized determination that the user would be dangerous because of his intoxication, then we are endorsing a disarmament regime based on categorical dangerousness judgments. In the majority's view, if you drink, then you can be disarmed. That was certainly not the historical tradition at the Founding.

of dangerousness rather than his actual threat of danger to others caused by his marijuana use, the tipping point is too low. Thus I respectfully dissent.